UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH URBAN, | ) | CIVIL ACTION NO. 4:20-CV-1622 |
| Plaintiff | ) | |
| | ) | (ARBUCKLE, M.J.) |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Defendant | ) | |

<u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Joseph Urban, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g).

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 6). After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, I find the Commissioner's final

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security. Under Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Commissioner Andrew Saul as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. 405(g).

decision is supported by substantial evidence. Accordingly, the Commissioner's final decision will be AFFIRMED.

## II.     BACKGROUND & PROCEDURAL HISTORY

On October 30, 2017, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act. (Admin. Tr. 15). In this application, Plaintiff alleged he became disabled on March 14, 2014. Plaintiff later amended his onset date to April 2, 2017, when he was fifty years old. Plaintiff alleges that he is disabled due to: sleep apnea, narcolepsy, and drowsiness. (Admin. Tr. 143). Plaintiff alleges that the combination of these conditions affects his ability to remember things, complete tasks, and concentrate. (Admin. Tr. 171). Plaintiff graduated from high school and participated in the regular education program. (Admin. Tr. 24). Before the onset of his impairments, Plaintiff worked as a maintenance worker, assembly worker, and mechanic. (Admin. Tr. 176).

On February 9, 2018, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 15). On February 28, 2018, Plaintiff requested an administrative hearing. *Id.*

On December 6, 2018, Plaintiff, assisted by his counsel, appeared and testified during a hearing before Administrative Law Judge Michelle Wolfe (the "ALJ"). *Id.* On April 17, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 26). On June 20, 2019, Plaintiff requested review of the ALJ's

decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 118).

On July 8, 2020, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 1).

On September 8, 2020, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence, and improperly applies the relevant law and regulations. *Id.* As relief, Plaintiff requests that the Court find the Plaintiff disabled or, in the alternative, remand the case for further proceedings. (Doc. 1, p. 3).

On March 16, 2021, the Commissioner filed an Answer. (Doc. 15). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. *Id.* Along with her Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 16).

Plaintiff's Brief (Doc. 19) and the Commissioner's Brief (Doc. 20) have been filed. Plaintiff did not file a reply. This matter is now ripe for decision.

## III.   STANDARDS OF REVIEW

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals.

A.   **SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.

Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.   **STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).[2] To satisfy this requirement, a claimant must have a severe

---

[2] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was

physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R.

---

issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on April 17, 2019.

§ 404.1545(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; *Mason*, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 404.1512(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which

evidence he has rejected and which he is relying on as the basis for his finding."

*Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

Having reviewed the applicable legal standards, I now turn to the merits of Plaintiff's claims.

## IV.  DISCUSSION

In his statement of errors, Plaintiff raises the following issue:

(1)     Is there substantial evidence to support the ALJ's Decision that Plaintiff is not disabled and does not meet or equal a listed impairment?

(Doc. 19, p. 4).

### A.  THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In her April 2019 decision, the ALJ found that Plaintiff met the insured status requirement of Title II of the Social Security Act through March 31, 2018. (Admin. Tr. 26). Then, Plaintiff's application was evaluated at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between April 2, 2017 (Plaintiff's amended alleged onset date) and March 21, 2018 (Plaintiff's date last insured) ("the relevant period"). (Admin Tr. 17).

At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairment: narcolepsy. (Admin. Tr. 18).

The ALJ also identified the following medically determinable non-severe impairments: hypogonadism; sleep apnea; hypertension; and obesity. (Admin. Tr. 18-19).

At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 19).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to:

> perform work at all exertion levels as defined in 20 C.F.R. § 404.1567(c) except he was limited to only occasional climbing, but never on ladders, ropes, or scaffolds, avoiding moderate exposure to hazards including moving machinery and unprotected heights.

(Admin. Tr. 20).

At step four, the ALJ found that, during the relevant period, Plaintiff could not engage in his past relevant work. (Admin. Tr. 24).

At step five, the ALJ found that, considering Plaintiff's age, education and work experience, Plaintiff could engage in other work that existed in the national economy. *Id.* To support her conclusion, the ALJ relied on testimony given by a vocational expert ("VE") during Plaintiff's administrative hearing and cited the following three (3) representative occupations: patient transporter (DOT #

355.667.014), laundry worker (DOT # 361.687-018), and packer (DOT # 920.687-134). *Id.* at 25.

B.   **WHETHER THE ALJ CREDITED THE MEDICAL DIAGNOSIS OF NARCOLEPSY**

The Social Security Administration's Program and Operations Manual System ("POMS") defines narcolepsy as:

[A] chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events:

1.   Cataplexy—attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious.

2.   Hypnagogic hallucinations—hallucinations which occur between sleep and wakening.

3.   Sleep paralysis—a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep.

POMS DI 24580.005. The POMS also provides that:

There are no physical abnormalities in narcolepsy, and with the exception of sleep studies, laboratory studies will be normal. The sleep symptoms will range from mild drowsiness to severe sleepiness in which the individuals spend the entire day drifting in and out of sleep, unable to work, play or supervise the home. Sleep periods range from a few seconds to 30 minutes. The sensation is described as ordinary but uncontrollable drowsiness. When observed by others, the sleep appears natural and is readily interrupted by stimuli. Once awakened, the narcoleptic patient is alert. Not all individuals will have all of the symptoms. Cataplexy, however, is observed in 70 percent of all cases, and its associated presence is ordinarily sufficient to establish narcolepsy, without laboratory sleep studies.

*Id.*

At step two of the sequential evaluation process, the ALJ identified narcolepsy as Plaintiff's only medically determinable severe impairment during the relevant period. (Admin. Tr. 17-18). Then, in the RFC assessment the ALJ summarized Plaintiff's treatment history as follows:

> Regarding the claimant's narcolepsy, medical treatment records from Aileen L. Love, M.D. indicate a medical history in which the claimant underwent a Multiple Sleep Latency Test (MSLT) in 2012, pre-alleged onset date, which results **"highly suggestive" of narcolepsy** (Exhibit 3F, p. 5), and a **subsequent narcolepsy diagnosis** (Exhibit 3F, p. 4), despite the fact the claimant denied symptoms of cataplexy, hypnagogic hallucinations, or sleep paralysis (Exhibit 3F, p. 4). Additionally, more recent records from Dr. Love indicate **no definitive diagnosis of narcolepsy** (Exhibit 3F, p. 5). The claimant began taking daily medication and had some symptomatic improvement with excessive sleepiness, but due to financial reasons stopped that medication and tried different medications with varying results. Notes indicated the dose never increased, and claimant then remained off stimulant medication for a period of 9 months (Exhibit 3F, p. 4).
>
> An April 2, 2015 treatment note from the claimant's primary care provider, Dr. Walter Setlock at Integrated Medical Group, PC, noted that a lab technician from US Sleep Lab was trying to schedule an appointment for the claimant to check his narcolepsy, but the claimant never called back (Exhibit 1F, p. 41)). Otherwise, the medical evidence of record shows no significant treatment for or evidence of narcolepsy until Dr. Setlock referred the claimant to Zia Shah, M.D. on October 14, 2017 for pulmonary/sleep disorder consultation after the claimant reported he fell asleep at work, approximately six months after the claimant's alleged onset date. Notes indicated the claimant took Modifinil daily, but had an irregular sleep schedule (Exhibit 2F, p. 3). Dr. Shah performed a physical examination showing all results within normal limits. However, despite the normal finding, she advised the claimant not to drive if he was sleepy or tired (Exhibit 2F, p. 4), and subsequently noted a "possible diagnosis of narcolepsy, denied any other significant medical issues" (Exhibit 2F, p. 2). Records from Dr.

Love indicated at this time the claimant reported that []he stopped using a continuous positive airway pressure (CPAP) machine and Wellbutrin for depression associated with sleepiness (Exhibit 3F, p. 4).

On December 18, 2017, Dr. Setlock noted the claimant had no narcoleptic waves on his polysomnogram (PSG) and continuous positive airway pressure (CPAP) study and the claimant was advised to set a sleep pattern, with which he refused to comply. Notes indicated the claimant was going to sleep anywhere from 10:00 pm to 3:00 am, drinking energy drinks, and napping during the day due to being tired. Additionally, **a note in the record indicated that Dr. Shah did not think the claimant had narcolepsy** (Exhibit 1F, p. 32). **Records from Dr. Setlock likewise on January 22, 2018 noted "?Narcolepsy."** (Exhibit 1F, p. 31).

Treatment notes from April 2018 to September 2018 show the claimant received additional treatment from Dr. Love (Exhibit 3F). On April 19, 2018, Dr. Love documented an Epworth Sleepiness Scale (ESS) score of 16 (Exhibit 3F, p. 4), and noted that now that the claimant was unemployed, his sleep schedule was completely erratic, sometimes staying up all night and sleeping during the day. His physical examination was within normal limits, including a grossly normal neurologic examination, although notes indicated he was about to doze off during his office visit. **Although Dr. Love noted that results from a 2012 sleep study were highly suggestive of narcolepsy, she did not definitively diagnose the claimant with narcolepsy in 2018.** She did, however, recommend the claimant restart stimulant medication and prescribed Adderall. Dr. Love noted that although some sleep/wake disturbances could be secondary to narcolepsy, since applying for disability the claimant had an even greater disruption in his sleep schedule and counseled him on improvement (Exhibit 3F, p. 5). She did note that the claimant should not drive until symptoms of excessive sleepiness were under better control (Exhibit 3F, p. 6). **Although there was no definitive diagnosis of narcolepsy from the alleged onset date to the date last insured, the undersigned finds narcolepsy to be a severe medically determinable impairment because the claimant was restarted on medication for narcolepsy in an effort to control his alleged symptoms.**

(Admin. Tr. 21-22) (emphasis added).

In his brief, Plaintiff argues that the ALJ's decision is defective because the ALJ mischaracterized Plaintiff's diagnosis of narcolepsy as "not definitive" and argues that the ALJ improperly required diagnostic testing to confirm the diagnosis when, pursuant to the POMS none is required. (Doc. 19, pp. 7-8). I am not persuaded. Although Plaintiff is correct that at the conclusion of the above-quoted passage the ALJ concludes that there was "no definitive diagnosis of narcolepsy" in the records between April 2, 2017 and March 31, 2018, she found that narcolepsy was a medically determinable impairment despite this lack because Plaintiff was *treated* for narcolepsy. *See* POMS DI 24580.005 (noting that narcolepsy is most frequently "treated by the use of drugs such as stimulants and mood elevators."). Furthermore, I find that the ALJ accurately summarized the, occasionally ambiguous, diagnostic language in the treatment records she cited.

In her summary, the ALJ references five pages from two separate exhibits in his discussion of Plaintiff's narcolepsy diagnosis: Exhibit 3F, pp. 4-6, and Exhibit 1F-31-32.

The relevant pages of Exhibit 3F refer to an April 19, 2018 treatment record from Dr. Love, which post-dates the end of the relevant period by 19 days. This April 19, 2018 examination was Plaintiff's first visit with Dr. Love. (Admin. Tr. 335) (noting that Plaintiff established care with Dr. Love on April 19, 2018). Under the heading "progress notes," Dr. Love wrote:

I had the opportunity to evaluate Joseph T Urban at the Lehigh Valley Health Network for sleep disordered breathing and narcolepsy.

He first noted some excessive sleepiness when he was in his late thirties.

He had worked as an electrician, performing shift work at the time and was noted to fall asleep at work. He was diagnosed with narcolepsy in 2012. He had an MSLT with a mean sleep onset of 0.9 minutes on 4 naps with REM sleep noted on all naps. He was started on Nuvigil 250 mg daily and he had some symptomatic improvement with his excessive sleepiness. He was unable to afford the Nuvigil. He was given Ritalin 10 mg 3 times day in place in the Nuvigil and did not have notable improvement. He was them prescribed modafinil 200mg daily which he used several months and he had minimal improvement with the medication as well. The dose was never increased. He has remained off stimulant medication for 9 months.

He established care with a new physician in October 2017 at US Sleep Pa. He notes that he had gained 10 pounds from 2012. He was also initiated on a supplemental testosterone for a few years. He had a repeat sleep study performed by the new sleep center that demonstrated he had an AHI 19 events/hour with an oxygen nadir: 77%. An MSLT was not performed.

He was initiated on a CPAP in October 2017 and used it for several months. He does not know the settings. He never had any symptomatic improvement with the machine. He was not using modafinil with the CPAP. He was given a prescription of Wellbutrin by his primary care for depression associated with sleepiness. He experienced nausea and insomnia with the medication and so stopped both the CPAP and the Wellbutrin. He has now been on disability because he has not been able to work due to excessive sleepiness. His ESS= 16 today. No MVAs associated with sleepiness.

His wife does noted that he will sometimes fall asleep even when sitting and eating.

He denies a history of parasomnias. He denies symptoms of cataplexy, sleep paralysis or hypnopompic hallucinations.

The patient[] states that he has snored for many years. There are not witnessed apneas. His wife notes that he primarily sleeps on his back.

Now that he is unemployed, his sleep schedule is completely erratic. He will sometimes stay up all night and then sleep during the day.

He currently does not drink alcohol. The patient denies tobacco use or street drugs. He will consume[] coffee occasionally. He does not feel as though it makes much of a difference.

He states his legs sometimes bother him at night.

(Admin. Tr. 307-308).

Under the sub-heading Impression/Plan, Dr. Love wrote:

**Narcolepsy**: He had evidence of REM sleep on 4/4 naps on MSLT from 2012. This is highly suggestive of narcolepsy. I think he needs to restart stimulant medication. I have prescribed Adderall 5 mg twice daily. Ideally, I would refer to treat him with a higher dose of modafinil but he and his wife are concerned about the cost. I have placed a CCT consult to review pharmaceutical options available. We may want to explore Xyrem in the future, but he needs to establish treatment for his sleep disordered breathing first.

**Obstructive sleep apnea**: The patient has evidence of moderate obstructive sleep apnea on a sleep study in October 2017. His DME: Nationwide medical. He has a full face mask and needs a medium. Recommended that he reinitiate CPAP use and follow-up with DME regarding supplies. It is not uncommon for patients to have both narcolepsy and CPAP. I don't expect that CPAP alone will improve hypersomnia, but my hope is that PAP in tandem with stimulants will better control his symptoms. I have asked that he bring his PAP and SD card for evaluation at next visit. Healthy weight loss is also advised.

**Poor sleep hygiene**: Some of his sleep/wake disturbances may be secondary to narcolepsy but since applying for disability, he has had even greater disruption in his sleep/wake cycle. I have counseled him on the important of good sleep hygiene and have provided him with tips.

**I have counseled bot[h] him and his wife that he SHOULD NOT DRIVE until he symptoms of excessive sleepiness are under better control.**

(Admin. Tr. 308-09) (emphasis in original). Reviewing this treatment note, and the

ALJ's summary of it, I find that the ALJ accurately characterized its contents.

Exhibit 1F, p. 31 is a January 22, 2018 check box/fill-in-the-blank type record.

(Admin. Tr. 259). In a box marked "assessment" the clinician wrote:

- sleep apnea
  ? Narcolepsy
- hypogonadism
- 2 opinion for sleep physician
- continue Wellbutrin

(Admin. Tr. 259).

Exhibit 1F, p. 32 is a patient contact message dated December 18, 2017. This

message states:

Michelle from U.S. Sleep Lab called from Dr. Shah.
Patient and his wife were very upbeat at visit today. They though the CPAP would improve Joe to 100%. Joe does feel better but not where they thought he would be at 100%.
Wife asked for generic Wellbutrin per her friend who is an R.N. Dr. Shah does see symptoms of depression from the both of them but he will not write out a script for this for Joe.
He was advised to get a set sleep pattern ex.: 10-5 or 10-6 & he is not doing so. He is going to sleep at all hours of the night. He just feels since he is not working he could just stay up. He just refuses to follow a sleep pattern. He's been going to bed any where from 10-1 or even 3am & then naps during the day due to being tire[d].
He is doing energy drinks, rock stars & 5hour energy drinks.
Dr Shah does not feel its not narcolepsy [sic],
No narcoleptic waves on his PSG & CPAP study.
He also mentioned that he will be applying for disability.

Will be willing to write out Wellbutrin.

(Admin. Tr. 260). The ALJ accurately characterized pages 31 and 32 of exhibit 1F in his summary.

There is some support for the ALJ's assessment that there was no definitive diagnosis of narcolepsy in the treatment records from the relevant period. Nonetheless, the disorder was treated in the ALJ's decision as a medically determinable severe impairment. If the ALJ had found this impairment not medically determinable, Plaintiff's application would have been denied at step two. Thus, it is not clear how the ALJ's characterization of the diagnosis as possibly "not definitive" had any impact on the outcome of this case because the diagnosis was treated as medically determinable and was assessed at each step of the sequential evaluation process.

C.   **WHETHER THE ALJ'S EVALUATION OF NARCOLEPSY AT STEP THREE IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

At step three in the disability evaluation process, a claimant will be found disabled if his or her impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("listing of impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds that the claimant has an impairment or combination of impairments that meets a listing and meets the duration requirement, the claimant will be found disabled. *Id.* The listing of impairments describes impairments the Social Security Administration considers to be "severe enough to

prevent an individual from doing any gainful activity regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). A claimant who meets the requirements of a listed impairment at step three, as well as the durational requirement, will be found disabled.

Each individual listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). To meet the requirements of a listing, the claimant bears the burden of showing that he or she satisfies *all* the criteria in the listing. 20 C.F.R. § 404.1525(d); *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). An impairment, no matter how severe, that meets only some of the criteria for a listed impairment is not enough. *Sullivan*, 493 U.S. at 531.

If a claimant has an impairment that is not described in the listing of impairments, an ALJ will compare the claimant's "findings with those for closely analogous listed impairments." 20 C.F.R. § 404.1526(b)(3). "If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the ALJ] will find that [the claimant's] combination of impairments is medically equivalent to that listing." *Id.*

In this case, the ALJ found that Plaintiff did not have an impairment that met or medically equaled the severity of an impairment in the listings. In doing so, she explained:

> The record fails to establish that the claimant has an impairment or combination of impairments that meets or medically equals the criteria

of any listed impairment. The medical evidence of record does not document signs, symptoms and/or laboratory findings indicating any impairment or combination of impairments severe enough to meet the criteria of any listed impairment. No treating, examining, or non-examining medical source has mentioned findings or rendered an opinion that the claimant's impairments, singly or in combination, medically equaled the criteria of any listed impairment. Specific consideration has been given to the listings 3.00 *Respiratory Disorders* and 11.02 *Epilepsy* (per DI 24580.05 Evaluation of Narcolepsy).

The undersigned has considered listing 3.00, et. seq., dealing with disorders of the respiratory system, however, the medical evidence of record does not show listing-level severity as to narcolepsy in combination with sleep apnea or any respiratory impairment (See e.g. Exhibit 2F, p. 6, noting moderate obstructive sleep apnea after a polysomnogram report, but at p. 26 improvement noted after using a CPAP machine for 30 days; and Exhibit 3F, p. 17, noting continued improvement after switching to auto-PAP machine).

Listing 11.02 has also been considered, per DI 24580.05, in evaluating the severity of narcolepsy. In this instance, there was no definitive diagnosis of diagnostic testing confirming narcolepsy during the period between the claimant's alleged onset date and the date last insured (See, e.g. Exhibit 3F, p. 5, noting evidence "suggestive of narcolepsy, but no definitive diagnosis in 2018). Additionally, the medical record shows that the claimant denied symptoms of cataplexy, hypnagogic hallucinations, or sleep paralysis (Exhibit 3F, p. 4).

(Admin. Tr. 19).

In its Program and Operations Manual System ("POMS"), the Social Security Administration explains:

Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy.

The severity of narcolepsy should be evaluated after a period of 3 months of prescribed treatment. It is not necessary to obtain an

electroencephalogram (EEG) in narcolepsy cases. A routine EEG is usually normal, and when special attempts are made to obtain abnormal rapid eye movement (REM) sleep patterns, they may or may not be present even in true cases of narcolepsy. Also, narcolepsy is not usually treated with anticonvulsant medication, but is most frequently treated by the use of drugs such as stimulants and mood elevators for which there are no universal laboratory blood level determinations available. Finally, it is important to obtain for an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations or sleep paralysis.

*Id.*

Listing 11.02 provides:

Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

    A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

    B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

    C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

        1. Physical functioning (see 11.00G3a); or

        2. Understanding, remembering, or applying information (see 11.00G3b(i)); or

        3. Interacting with others (see 11.00G3b(ii)); or

        4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

        5. Adapting or managing oneself (see 1.00G3b(iv)); or

      D. Dyscognitive seizures (see 11.00H1b), occurring at least once overy 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

        1. Physical functioning (see 11.00G3a); or

        2. Understanding, remembering, or applying information (see 1.00G3b(i)); or

        3. Interacting with others (see 11.00G3b(ii)); or

        4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

        5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.02.

Regarding these regulations and the ALJ's application of them, Plaintiff argues:

> The ALJ's decision is not based on substantial evidence of record and did not properly review whether Plaintiff's impairment meets or equals a listing because she did not even acknowledge a definite diagnosis of narcolepsy. (TR p. 19) ("In this instance, there was no definitive diagnosis or diagnostic testing confirming narcolepsy during the period between Plaintiff's alleged onset date and date last insured".) (TR p 19) This runs directly contrary to POMS DI 24580.005 Evaluation of Narcolepsy which specifically acknowledges there will be no physical abnormalities and laboratory studies will be normal even in true narcolepsy. Furthermore, routine EEGs are typically normal as well. Despite this it appears the ALJ required diagnostic testing to confirm

narcolepsy and because there was no specific diagnostic testing to confirm narcolepsy, she did not even consider it to be a definitive diagnosis. This is error.

(Doc. 19, pp. 6-7). In support of his position that he meets a listing, Plaintiff cites to: an opinion by Dr. Love that Plaintiff would not be able to return to work until his symptoms of excessive sleepiness are better controlled; September 2012 instructions from Dr. Cable that Plaintiff was diagnosed with narcolepsy and should not drive; a diagnosis of narcolepsy by Dr. Shah; instruction from Dr. Shah that Plaintiff should not drive; a treatment note from Dr. Love that includes a diagnosis of narcolepsy. (Doc. 19, pp. 2-3).

Most of the evidence cited is in support of Plaintiff's position that his narcolepsy diagnosis is definitive. A diagnosis itself, however, is not enough to show that Plaintiff meets a listing. 20 C.F.R. § 404.1525(d) ("Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis"). Furthermore, Plaintiff fails to explain, or provide any support for, his position that daytime sleepiness, a driving restriction, and an opinion that he cannot work are equivalent in severity to the criteria of listing 11.02. Plaintiff specifically denies experiencing cataplexy, hypnagogic hallucinations, and sleep paralysis.

Accordingly, I am not persuaded that remand is required for further evaluation at step three.

## V.    CONCLUSION

Accordingly, Plaintiff's request for the award of benefits, or in the alternative

a new administrative hearing is DENIED AS FOLLOWS:

(1) The final decision of the Commissioner should be AFFIRMED.

(2) Final judgment should be issued in favor of the Commissioner of the Social
    Security Administration.

(3) An appropriate Order shall issue.

Date: March 2, 2022                          BY THE COURT

                                             _s/William I. Arbuckle_
                                             William I. Arbuckle
                                             U.S. Magistrate Judge